# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-657


STATE OF LOUISIANA

VERSUS

KYVONTE LATRELL EAGLIN



**********

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. CR-716-15
HONORABLE CRAIG STEVE GUNNELL, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Phyllis M. Keaty, Judges.


                                                                **AFFIRMED.**


**Cooks, J., dissents and assigns written reasons**.



Alfred F. Boustany, II
Boustany Law Firm
P. O. Box 4626
Lafayette, LA 70502
(337) 261-0225
COUNSEL FOR DEFENDANT-APPELLANT:
    Kyvonte Latrell Eaglin

**Michael C. Cassidy**
**District Attorney - 31st JDC**
**Bennett R. LaPoint**
**Assistant District Attorney**
**P. O. Box 1388**
**Jennings, LA 70546**
**(337) 824-1893**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PICKETT, Judge.**

## FACTS

The defendant, Kyvonte Latrell Eaglin, attended a party at the American Legion Hall in Jennings on August 8, 2015. An altercation broke out, and a group moved outside. The defendant went to his vehicle and retrieved a gun. Shots from one or more firearms were fired, and the victim, Jawon Lennette, was killed.

The defendant was indicted for second degree murder, a violation of La.R.S. 14:30.1, on December 16, 2015, as a result of the shooting on August 8, 2015, that resulted in the death of Jawon Lennette. Counsel filed a number of pre-trial motions, including a motion for a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999), as adopted by the Louisiana Supreme Court in *State v. Foret*, 628 So.2d 1116 (La.1993).

Counsel also filed a motion to declare the defendant indigent and to provide funds to retain a firearms expert. The trial court ruled on October 27, 2016, finding the defendant was indigent. However, the trial court denied the defendant's request to provide funds for him to retain an expert witness, and it denied his request to reopen the *Daubert* hearing to present new scientific evidence that purportedly refuted the state's expert's testimony. The defendant filed a proffer of the new evidence for purposes of appellate review on November 14, 2016.[1] He also proffered recorded statements of three witnesses.

The case went to trial on November 15, 2016. The jury rendered the responsive verdict of guilty of manslaughter on November 18, 2016. Although he was tried on a count of second degree murder, in closing argument the state argued the jury should return a verdict of guilt for manslaughter. The defendant filed a

---

[1]The proffer referenced a website where the report could be found in its entirety.

motion for new trial on December 6, 2016, which the trial court denied without a hearing. The defendant asked the trial court to reconsider the ruling, but the trial court denied his request on December 14, 2016.

The trial court sentenced the defendant to twenty years at hard labor on January 30, 2017. The defendant made an oral motion to reconsider his sentence, and the trial court denied it. The defendant timely appealed.

## ASSIGNMENTS OF ERROR

1. The district judge erred when he denied this indigent defendant's request for funds to hire a firearms expert.

2. The district judge erred when he allowed the State to argue that the jury should accept the testimony and opinions of the State's firearms expert, because the defendant never called a firearms expert to contradict that testimony.

3. The district judge erred when he concluded that the State's firearms expert was qualified to testify as a firearms expert, and that she proved that her testing procedure had sufficient scientific validity.

4. The district judge erred when he refused to allow the defense to re-open the *Daubert* hearing on the State's firearms expert, after a very recent scientific report was brought to the court's attention, and filed in the record, that cast considerable doubt on the scientific basis for the expert's procedure and conclusion.

5. The district judge erred when he allowed the State unlimited challenges for cause against all prospective jurors who expressed reservations about a mandatory life sentence for a 17-year old child.

6. The district judge erred when the defense raised a *Batson* challenge, and the State did not give adequate or legal reasons for removing African-American jurors.

7. The district judge erred when he allowed the State to introduce, as evidence of the defendant's "bad character," a copy of a Facebook photograph of the defendant, who was roughly 13 years old, that falsely portrayed him as a masked armed robber holding a dangerous pistol to the back of a child's head, as though ready to shoot the child, that the judge himself described as "inflammatory."

8. The district judge erred when he refused to allow the defense to present the testimony of eye witnesses who would have testified that the defendant appeared to have accidentally fired a shot at the alleged victim.

2

9.   The district judge erred when he refused to allow the defense to impeach the State's witnesses with prior inconsistent statements about how the shooting occurred.

10.  The district judge erred, as a matter of law, when he denied the defendant's motion for new trial, without a hearing.

11.  The district judge erred by failing to properly consider the mitigating factors when imposing the sentence and imposed an excessive sentence.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER THREE[2]

The defendant argues the trial court erroneously held the state's firearms expert was qualified to testify and that she proved her testing procedure had sufficient scientific validity.

*Daubert*, 509 U.S. 579, "set forth a means for determining reliability of expert scientific testimony and answered many questions as to proper standards for admissibility of expert testimony." *Foret*, 628 So.2d at 1121. When considering reliability, the trial court should first perform "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Illustrative, not exclusive, factors bearing on that assessment include whether the theory or technique can be and has been tested, whether it has been subjected to peer review and publication, "the known or

---

[2]The logical order of the defendant's claims is to address whether the state's expert was qualified to testify, whether the *Daubert* hearing should have been re-opened, whether the defendant was entitled to funding to hire a firearms expert, and whether the jury should have accepted the testimony of the state's expert where the defendant had no expert. Accordingly, we have addressed the defendant's first four assignments of error out of order.

3

potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation," and general acceptance of the theory or technique in the scientific community. *Id.* at 594. This gatekeeping function "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire*, 526 U.S. at 141. The inquiry must be applied to the facts of each particular case. *Id.*

Our supreme court adopted a three-part inquiry to determine the admissibility of expert testimony in *Cheairs v. State ex rel. Department of Transportation & Development*, 03-680 (La. 12/3/03), 861 So.2d 536. Quoting from the Eleventh Circuit's opinion in *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 562 (11th Cir.1998), *cert. denied,* 528 U.S. 812, 120 S.Ct. 309, *and cert. denied*, 528 U.S. 812, 120 S.Ct. 47 (1999), the court held expert testimony is proper when:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Cheairs*, 861 So.2d at 542. The *Daubert* evaluation applies to the second of these prongs. *Id.*

The trial court heard the defendant's *Daubert* motion on September 21, 2016. The state offered Michelle Cazes as its firearms analysis expert.[3] Ms. Cazes worked at the Louisiana State Police Crime Laboratory in crime scene and firearms analysis. She began her college studies at Southeastern Louisiana University, majoring in accounting. However, when Our Lady of the Lake College in Baton

---

[3]The record at times refers to Ms. Cazes's last name as "Olinde."

4

Rouge began offering a degree in forensic science, Ms. Cazes transferred and obtained her degree in that field.

After graduation, Ms. Cazes was accepted into a two-year training process with a Bureau of Alcohol, Tobacco, and Firearms (ATF) training academy. During the first phase of the program, she did research and wrote papers. In the second phase, she spent four months in Maryland "doing hands on exercises and training." The third phase gave her "mock evidence to work up like casework." She returned to Maryland for the fourth phase to "testify in like a mock trial." She received a certificate and has completed a competency and proficiency test each year

An outside company administers annual tests to evaluate Ms. Cazes's competency at the crime lab. Ms. Cazes has not given any wrong answers in any of the tests; she testified, "I've had all the correct answers." Ms. Cazes previously qualified as an expert forensic firearm analyst in four different Louisiana courts. At the time of the *Daubert* hearing, Ms. Cazes was in the process of becoming certified in firearm analysis with the Association of Firearm and Tool Mark Examiners (AFTE). She was already certified in crime scene analysis. Additionally, the crime lab is accredited by AFTE and falls under its protocol.

Ms. Cazes's method of analysis is to examine, compare, and reach a conclusion regarding evidence. Everything is verified. By doing the analysis this way, "developing the class characteristics, individual detail, and then the conclusion, every one [sic] would also come up with the same thing[]" because her procedures are generally accepted in the scientific community.

According to Ms. Cazes, the procedures have also been subjected to peer review, published in peer-reviewed journals, and shown to be reliable. Validation studies over the past fifty years have shown the ability to "distinguish between two firearms [and] the markings between them[.]" When "anything falls in the

5

threshold or the gray area[,] and it doesn't meet the threshold for identification," Ms. Cazes's practice is to "err on the side of caution" and give a result of inclusive.

In this case, Ms. Cazes received one live cartridge, one mushroom copper-jacketed bullet, two nine-millimeter cartridge cases (fired rounds), and three .40 caliber cartridge cases for analysis. She was able to identify the fired bullet as a nine-millimeter caliber. The same bullet was tested for DNA at the crime lab.

Ms. Cazes compared the two nine-millimeter cartridge cases to each other and determined they were "fired in the same unknown firearm." Additionally, "the jacketed hollow point cartridge . . . was microscopically compared to the cartridge case . . . and was determined to have been cycled through the same action of the same unknown firearm." Ms. Cazes found the markings on the nine-millimeter cases and the live round to be "similar as far as they showed the same . . . class characteristics and then some – the same individual detail."

She further microscopically compared the three .40 caliber cartridge cases and determined they had been fired from "the same unknown Glock or Glock-type firearm." She examined breech, chamber, extractor, ejector, and feed marks. The .40 caliber cases seemed to be fired from the same weapon; they "had the same firing pin shape, size, and then the individual detail." Ms. Cazes's findings were twice-verified, once in technical review and again in administrative review. She believed there was no rate of error. The protocol uses pattern matching. Ms. Cazes explained:

> [Y]ou want the patterns to line up identical[ly]. If they're slightly off or completely off – if they're slightly off but you have some that line up, then that – like I said, that would go in the inconclusive area. If they exactly line up, that would be the identification. And then if they're totally off or just totally different class characteristics, then that would be the elimination.

The bullet found with the victim's blood on it was fired from a nine-millimeter firearm, but Ms. Cazes could not say it was fired from the same weapon as the other cases. She testified it would require the gun or another bullet from it to make that comparison. Because no firearms were recovered in this case, and she could not identify the firearm from which that bullet was fired, she concluded two or three weapons could have been fired at the scene.[4] The trial court found Ms. Cazes's methodology was accepted under the *Daubert* standard, and it accepted her as a forensic firearm analyst. The state proved her educational background in the field of forensic science, a specific in-depth training program in forensic science, and her proficiency in the field, verified by annual competency tests. The defendant submitted nothing to show she was not qualified to testify as an expert in forensic firearms analysis in this case.

We find that the state presented sufficient evidence to satisfy the standards of *Daubert*, 509 U.S. 579, and of *Cheairs*, 861 So.2d 536. Ms. Cazes testified her methodology was verified, accepted in the scientific community, subjected to peer review, and shown to be reliable. Others doing the same analysis would reach the same conclusion because of these standard procedures. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

The defendant contends the district court erred when it refused to re-open the *Daubert* hearing after the defendant brought a recent scientific report to the court's attention and filed it into the record. He alleges the report cast considerable doubt on the scientific basis for Ms. Cazes's procedure and conclusion.

---

[4]The two or three weapons would have been one that shot the .40 caliber cartridges and one or two nine-millimeter weapons.

In this assignment of error, the defendant states the law allows a trial court to review and reconsider an interlocutory ruling prior to final judgment if substantial justice is served. The defendant contends this applies to the report he submitted to the court. The defendant makes no argument. He cites only one case, *Ryan v. State Farm Mutual Automobile Insurance Co.*, 10-961, 10-962 (La.App. 1 Cir. 12/22/10), 68 So.3d 563, *writ denied,* 11-172 (La. 4/1/11), 60 So.3d 1250. That case merely states "a trial judge may, at his discretion, change the substance or the result of interlocutory rulings." *Id.* at 566.

The defendant's brief fails to identify how the trial court abused its discretion in failing to reopen the *Daubert* hearing. The brief notes, "This request was addressed at [Record] Pages 199-209; 220-234; [and] 715-731." However, the defendant may not incorporate arguments made in the trial court into his appellate brief by reference. *Bennett v. Hughes*, 03-1727 (La.App. 4 Cir. 5/26/04), 876 So.2d 862, *writ denied,* 04-1599 (La. 6/30/04), 877 So.2d 122. Such a reference is insufficient to constitute briefing of this assignment of error. Uniform Rules—Courts of Appeal, Rule 2-12.4; *Theriot v. Bourg*, 96-466 (La.App. 1 Cir. 2/14/97), 691 So.2d 213, *writ denied*, 97-1151 (La. 6/30/97), 696 So.2d 1008.

The defendant's reply brief, however, argues knowledge of scientific information casting doubt on the validity of an expert's qualifications, procedure, or opinion requires the trial court to reopen the *Daubert* hearing. Failure to reopen it, the defendant contends, is an abuse of the trial court's discretion.

Uniform Rules—Courts of Appeal, Rule 2-12.6, requires a reply brief to be "strictly confined to rebuttal of points urged in the appellee's brief." Where a reply brief "goes beyond mere rebuttal and attempts to raise a new legal argument[,]" an appellate court should not address the new issues. *McGregor v. Hospice Care of*

8

*Louisiana in Baton Rouge L.L.C.*, 09-1355, 09-1356, p. 9 (La.App. 1 Cir. 2/12/10), 36 So.3d 281, 287 n.2, *writ denied*, 10-832 (La. 5/28/10), 36 So.3d 258.

The defendant's original brief did not allege an abuse of discretion by the trial court. While it argued the trial court could have reopened the *Daubert* hearing, it did not state why it should have. We do not consider the arguments advanced in the reply brief as proper rebuttal argument.

We consider this assignment of error abandoned. *See Bennett*, 876 So.2d. 869.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant contends the trial court erred by denying his request for funds to hire a firearms expert. Once again, the defendant refers to his numerous filings in the trial court to explain his need for a firearms expert. Our courts do not allow this practice. Uniform Rules—Courts of Appeal, Rule 2-12.4; *Theriot*, 691 So.2d 213.

Further, none of the motions to which the defendant's appeal brief refers requested funding except "Defendant's Motion for Declaration of Indigency, and for Funds for a Forensic Firearms Expert," filed on October 18, 2016. That motion sought funding to refute Ms. Cazes's expert testimony "that in her scientific opinion the bullets and/or cartridge casings were cycled through the action and/or fired from the same unknown firearm."

The defendant's appellate brief states, "We also know now that the bullet casings may have fingerprints on them, and that evidence can be obtained with the assistance of a firearms expert." That issue was not brought before the trial court. Rather, counsel for both parties questioned Ms. Cazes at the *Daubert* hearing about her methodology of comparing bullets and casings. She concluded two or possibly

9

three firearms were present at the scene. Again at trial, she testified to the possibility of three guns firing the bullet fragment and cartridge casings.

Well into her trial testimony, during cross-examination, Ms. Cazes was asked for the first time about fingerprints being set into bullets when they are fired. This issue was not raised before that point. Ms. Cazes testified fingerprints could be obtained from a live round or from casings "picked up after the firing process[.]" She was questioned about whether body salts could etch fingerprints into a casing when a gun was fired. She testified that as a firearms expert she does not test for fingerprints and further testing for that process was not performed by the lab in this case because it was not requested.

This court may not consider the defendant's request to fund an expert to testify about whether fingerprints can be etched on fired casings because the issue was not raised in the trial court. The defendant never asked the trial court anything about funding for such tests. Although his brief states we "know now" about this possibility, he identifies no source of that knowledge or how or when he became aware of it. No expert testified regarding this possibility or whether this actually occurs. Defense counsel discussed the theory with Ms. Cazes at trial:

> Q. . . . . Somebody loading bullets will probably finger the bullets in order to load them into a cylinder or a magazine, right? They might touch it.
>
> A. Yes, sir.
>
> Q. And so by touching them, it leaves tiny quantities of salty sweat with each time they touch it, right?
>
> A. Yes.
>
> Q. All right. And then when the bullet is fired away from its casing, there's tremendous heat and instantly transfers that salty sweat to the metal. It vaporizes the moisture, and it sets the salts for those prints. Does that make sense?
>
> A. Yes, sir.

Q. Okay. And the salts become molten and a chemical reaction with metal etches of the fingerprints are permanently into the casing?

A. Yes, sir.

Q. Makes sense.

This colloquy is nothing more than counsel's testimony, not questioning, about a theory not established by any evidence other than Ms. Cazes's one word responses. If the defendant wanted to establish this possibility, which seems to indicate that it might be possible, and obtain the concomitant tests, he could have asked the trial court to fund the hiring of this type of expert. He did not, and he may not raise the issue on appeal. Uniform Rules—Courts of Appeal, Rule 1-3.

The defendant's appellate brief, however, correctly argues the Fourteenth Amendment guarantees him a fair opportunity to present a defense. To obtain funding for an expert witness, the defendant must show "a need for the funding by establishing with a reasonable degree of specificity what type of expert is needed and the purpose for which the expert is required." *State v. Lee*, 05-2098, p. 41 (La. 1/16/08), 976 So.2d 109, 137, *cert. denied*, 555 U.S. 824, 129 S.Ct. 143 (2008). He must also show "it is more likely than not the expert assistance will be required to answer a serious issue or question raised by the State's or defense's theory of the case, and that denial would result in an unfair trial." *Id.* If a defendant meets that burden, "the trial court is to order the state to provide those funds." *Id.* The trial court's denial is subject to review under an abuse of discretion standard. *Id.*

The defendant's motion sought funding to hire an expert to refute Ms. Cazes's testimony "that in her scientific opinion the bullets and/or cartridge casings were cycled through the action and/or fired from the same unknown firearm[,]" based on the report by the President's Council of Advisors on Science and Technology (PCAST) dated September 2016. The report was entered into

11

evidence at trial as Exhibit D-3.  Pertinent portions of the report were filed into the record as part of "Defendant's Motion for Declaration of Indigency, and for Funds for a Forensic Firearms Expert" on October 18, 2016.  The trial court denied that motion.

The defendant's motion argued the report showed Ms. Cazes's methodology to be invalid in spite of having had the expert's report for seven months.  The defendant filed the motion just a few weeks prior to the scheduled trial on November 15, 2016.  At the hearing of the motion on October 27, 2016, the defendant's counsel repeatedly told the trial court he was not seeking a continuance of the trial.  However, at the hearing three weeks before the scheduled trial, defense counsel refused to answer the trial court's question as to whether he had an expert in mind.  The trial court tried several ways to obtain an answer to that question:

> THE COURT:  My question to you, have you consulted a firearm's [sic] expert since March?  Have you consulted one at this point in time?  Yes or no?  A simple question.
>
> MR. BOUSTANY:  Judge –
>
> THE COURT:  A simple question.
>
> MR. BOUSTANY:  What I do representing the defendant, I think –
>
> THE COURT:  You're requesting a firearm's [sic] expert from this Court so you have to tell me whether you have one or not, okay?  Because you want me to pay you for it.
>
> MR. BOUSTANY:  I can't have one if [Defendant] can't afford it.  I can't expect a firearm expert to consult with me when I don't pay them.  That's why we are here.  I have to pay the firearm's [sic] expert.
>
> THE COURT:  So you're telling me you do not have a firearm's [sic] expert and you have not contacted on[e] or sought one out since March?

12

MR. BOUSTANY:    No, I'm not telling you that.  No, I'm not telling you that.

Counsel told the trial court his unidentified expert:

> would testify that the casings that the [S]tate's expert said she looked at and they looked like they had similar markings and as a result she gave an opinion that they would have been fired from the same gun even though the gun was not recovered, and that she has a zero error rate, that testimony is what we need an expert for.  It is that testimony itself that we will need an expert.

The defendant received Ms. Cazes's expert report in March of 2016.  As previously noted, he did not seek funding for his own expert until approximately seven months later.  At the hearing of the motion, defense counsel told the trial court:

> And so the [S]tate's position appears to be that the casings that were found came from only one gun, and that gun had to be the defendant's gun, and that means that the defendant shot the alleged – the victim.

To the contrary, the state's expert testified at the hearing she believed, based on her examination of the casings recovered from the scene, using pattern matching methodology, that at least two and possibly three guns were present.

The defendant seeks to challenge Ms. Cazes's qualifications and methodology based solely on this new report.  *Daubert* and *Kumho Tire* set the standard for determining the reliability and admissibility of expert testimony, and that standard may not be added to, subtracted from, or altered by an advisory report.

Further, the question the defendant wanted an expert to answer was whether the casings Ms. Cazes examined were fired from the same gun.  Specifically, he said he wanted an expert to say there was more than one gun fired at the scene.  Ms. Cazes answered that question favorably to the defendant.  She testified at the *Daubert* hearing and at trial about the possibility of three guns being present at the scene.  The jury heard her testify she could not determine whether the bullet

13

fragment recovered that had the victim's DNA was fired from the same gun as the casings because she did not have a gun to examine. Thus, the defendant did not show how a firearms expert would have aided him in the defense of his case, and the trial court did not err in denying the motion.

### ASSIGNMENT OF ERROR NUMBER TWO

The defendant contends the trial court erred by allowing the state to tell the jury in its closing argument that it should accept the testimony and opinions of the state's firearms expert when he never called a firearms expert to contradict that testimony, and his motion to fund such an expert was denied.

During the state's closing rebuttal argument, counsel said:

> Mr. Boustany, the defendant, [sic] got up here and – and he gave his opinion about how this stuff got there, and how the shots were fired and everything. Did you hear one defense expert get up there and say what he said? There was no defense testimony that supported Mr. Boustany's statements about how these shots were fired (indicating) and how that stuff got there. Not one expert witness called by the defense. There was no evidence of that.

Defense counsel requested a sidebar conference where he pointed out the defendant had no obligation to present any evidence, and the burden was on the state. He asked "that [the state] not make that argument," and he asked for a jury instruction to disregard counsel's remarks.

The trial court responded, "Okay. This – this is the way I look at it: He can make the argument that's your presentation. It's just your opinion." Defense counsel agreed. The trial court then told counsel, "But you can't say the defendant did not put on any evidence." Again, defense counsel agreed. When defense counsel again requested an instruction, the trial court told the jury, "Ladies and gentlemen of the jury, the defendant – again, the defendant does not have to put on any evidence, okay. Also, the statements of the attorneys is [sic] not evidence."

14

Defense counsel lodged no objection and made no further mention regarding the issue.

This assignment of error lacks merit. Defense counsel stopped the state's closing argument, requested the sidebar, and agreed with what the trial court told the state's counsel. He requested a special instruction to the jury, and he got it. The defendant has identified no erroneous conduct by the trial court regarding this issue.

**ASSIGNMENT OF ERROR NUMBER FIVE**

The defendant contends the trial court erred by allowing the state unlimited challenges for cause against all prospective jurors who expressed reservations about a mandatory life sentence for a seventeen-year-old child. In other words, he argues too many potential jurors were excused because they may have been unable to convict a minor who would be sentenced to mandatory life in prison.

In *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455 (2012), the United States Supreme Court held mandatory life imprisonment without the possibility of parole for defendants under the age of eighteen at the time of the offense violated the federal constitutional prohibition on cruel and unusual punishment. The defendant here was seventeen years old at the time of this offense.

During *voir dire*, the state told prospective jurors the sentence for a defendant convicted of second degree murder is mandatory life in prison. When one potential juror asked whether such a defendant would be eligible for parole, both the state and the trial court told the potential juror the law required life without benefit of probation, parole, or suspension of sentence.

Defense counsel did not contemporaneously object to this misstatement of the law during that particular discussion. When the state requested specific potential jurors be excused for cause, only then did defense counsel state, outside

15

the presence of the venire, "actually the U.S. Supreme Court has said you can't give a juvenile life[.]" This statement by defense counsel is also not a correct statement of law. Even then, he did not object to what was told to the venire. Rather, he objected to the state's causal challenge, stating, "I don't think that [the potential juror] has said that if the Court instructed him that he would have to apply the law that he could not apply the law." His objection does not address the misstatement of the law.

Later in *voir dire*, the state again asked the panel whether the fact the defendant would receive life imprisonment with a guilty verdict would prevent the jurors from returning such a verdict. Again, defense counsel did not object. He did not assign the erroneous statement of the law as error in his appellate brief. Indeed, had he done so, this court would be prohibited from considering such an assignment pursuant to La.Code Crim.P. art. 841 because counsel made no contemporaneous objection.

The defendant's argument is unreasonably circular. Presumably, he would have wanted to seat people on the jury who could not convict him of second degree murder because they did not want him sentenced to mandatory life. The reason those potential jurors thought the defendant would receive a life sentence resulted from the trial court's and the state's erroneous portrayal of the law. The defendant did not object to that erroneous portrayal nor did he ask any questions regarding this issue during his questioning of potential jurors. Had he done so and had the trial court correctly instructed the jury on the law, those potential jurors who were released for cause for that reason may have been able to fairly convict the defendant as charged, knowing of the possibility of parole. Defense counsel, however, never actually made an objection on the record and never asked for a corrected instruction.

16

The defendant's reply brief erroneously states the defendant asked the trial court to correctly instruct the jury on the penalty for second degree murder before the trial, and the trial court gave the wrong instruction. The record reflects no such request. The trial court again advised the jury immediately before opening statements and during jury instructions before they retired, that second degree murder carried a mandatory life sentence with no possibility for parole. The defendant entered no objection. In fact, when asked, he specifically said he had no objection to the jury instructions. As shown above, he merely argued against the state's challenges for cause.

The reply brief further argues "all of the prospective jurors heard the wrong law, and all had to commit to following that unconstitutional law. None should have been seated in the first place. All the defendant could do was to try to remove the worst of the jurors . . . ." The defendant did not make this argument in his original appellate brief. He may not raise new arguments in his reply. Uniform Rules—Courts of Appeal, Rule 2-12.6.

Further, the defendant used only eleven of his twelve peremptory challenges. This assignment of error does not complain that the defendant had to use his peremptory challenges in order to exclude "the worst of the jurors"; it complains that the state was allowed to remove too many jurors because of the misstatement of the law to which he entered no objection.

For these reasons, this assignment of error lacks merit.

### ASSIGNMENT OF ERROR NUMBER SIX

The defendant contends the trial court erred in denying his challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986), where the state did not give adequate or legal reasons for removing African-American jurors.

17

He cites no statutory authority or jurisprudence, and he does not identify the jurors at issue.

The defendant's entire argument for this assignment of error states:

> The defense objected that the State successfully used its challenges for cause against at least two other African-American jurors who had reservations against a life sentence without parole for a child. The State then wanted to use a peremptory challenge against another African-American juror who "would follow what the other jurors did" even though he later clearly and unequivocally indicated that he would not do that. Pages 1066-1067[.] In fact, when the State tried to use a challenge for cause against this juror for that reason, the judge denied it because the judge agreed that this juror had indicated that he could make his own independent decision. Page 1065; 1044-1046[.] But the judge allowed the State to use a peremptory challenge to remove this African-American juror for the same reasons.
>
> The stated reason was legally insufficient to remove this juror.

Defense counsel did not identify any of the African-American jurors who were subject to the state's challenges. He further made no *Batson* analysis applying the facts of this case.

Based on the wording of the defendant's brief, we believe counsel is discussing only the juror whose *voir dire* is contained in the cited pages of the record. We have determined that juror is Stanley Leopold.

The trial court denied the state's challenge for cause concerning Mr. Leopold. The state then used a peremptory challenge, and defense counsel raised a *Batson* challenge. After a discussion, the state asked the trial court to overrule the *Batson* challenge, and the trial court stated, "All right. At this time, the Court is going to overrule the Batson challenge, okay." Discussion then immediately moved to another juror. Defense counsel did not object to the trial court's *Batson* ruling. His brief does not indicate any place in the record where Mr. Leopold was discussed again.

18

"Failure to object to the trial court's ruling on a *Batson* challenge waives the issue on appeal." *State v. Richard*, 16-525, p. 7 (La.App. 3 Cir. 4/5/17), 216 So.3d 1128, 1134 (citing *State v. Odenbaugh*, 10-268 (La. 12/6/11), 82 So.3d 215, *cert. denied*, 568 U.S. 829, 133 S.Ct. 410 (2012)); La.Code Crim.P. art. 841. Accordingly, we find defense counsel waived his right to raise this issue on appeal.

## ASSIGNMENT OF ERROR NUMBER SEVEN

The defendant argues the trial court erred when it allowed the state to introduce, as evidence of the defendant's "bad character," a copy of a Facebook photograph of the defendant, who was roughly thirteen years old in the photograph. They argue that the Facebook photo falsely portrayed him as a masked armed robber holding a dangerous pistol to the back of a child's head, as though ready to shoot the child, that the court itself described as "inflammatory."[5]

Jennings Police Chief Todd D'Albor testified he spoke with a witness, Kelly Neal, at the scene of the shooting. Ms. Neal showed Chief D'Albor "her cellphone which provided a social media site that had identified the defendant[,]" who was a suspect. She pulled up the defendant's Facebook page and showed him the defendant's photograph. Chief D'Albor testified that Ms. Neal "scrolled through a few things" on the defendant's Facebook page, but he did not recall anything that "stuck out" to him, other than the photograph offered into evidence as Exhibit S-2. He did not recall anything else about that photograph

The state's counsel then asked Chief D'Albor, "Would you recognize a photograph of that Facebook page if you were shown it?" When Chief D'Albor said he would, the state's counsel offered Exhibit S-2 into evidence as "one of the photographs" Chief D'Albor saw on the defendant's Facebook page.

---

[5] Interestingly, the state's counsel objected when Defendant's attorney questioned a witness about photographs taken from another Facebook page. He argued they were hearsay and had "no relevancy to these proceedings" other than "to try to depict [the victim] in a bad light in front of the jury."

Defense counsel objected when the state offered Exhibit S-2 into evidence. He argued the prejudicial effect of the photograph outweighed its probative value, the authenticity of the photograph was not established, it was irrelevant, and the purpose of introducing the photograph was "simply to prejudice the jury."

The state argued the photograph "shows that he has a gun – that he has a handgun . . . and that he doesn't always use that gun for protection. That he does other things with that gun besides keeping it for protection . . . ." Defense counsel pointed out Ms. Neal had already identified the defendant at that point. The trial court agreed the photograph was inflammatory. However, he overruled the defendant's objection without further comment and allowed the photograph into evidence.

Exhibit S-2 depicts a young African-American man wearing printed pajama-style pants and a bandana over the lower part of his face. He appears to be holding a handgun to the head of another boy, whose back was to the defendant and whose face was pressed against a wall. The pair appears to be standing in a hallway.

Chief D'Albor later testified he did not know Exhibit S-2 was a picture of the defendant at the time Ms. Neal showed it to him. Equivocal testimony, with questions from the defendant's counsel, did nothing to clear the confusion about the purpose for which Chief D'Albor considered the photograph:

> Q. Okay. So did she tell you that she wasn't using her own phone that she was using someone else's phone?
>
> A. No, sir, she didn't.
>
> Q. So what you were looking for was, hey, give me a photograph of the guy you're talking about so I can use that to try to find him; right?
>
> A. Actually, I didn't illicit [sic] it. She showed it.
>
> Q. Okay. Yeah, but you want to do is see the photograph that best helps you depict what the guy looks like that you're looking for.

A. We wanted to identify the person; correct.

. . . .

Q. The one that the [S]tate asked you to identify S-2, did you take that and say, yeah, that really looks – that's a great picture and we are going to take that and we are going to go and try to find this guy.

A. No. This as I've said, this picture was printed by one of our investigators.

Q. One of your investigators printed that?

A. Printed the picture, yes. Obviously, when she's scrolling through on the phone you can't – couldn't have printed it right there. But as I recalled it, when she scrolled I noticed because it's a pretty obvious picture, I didn't know that at the time that that was him. So to answer your question I didn't know at the time that that was him, but if you've had an opportunity to hear Mrs. Neal she goes fast.

Q. Oh, she was going really fast. Her speech was --

A. It's fast so you try to decipher the information as best you can because we are trying to identify a suspect on this case of who's responsible for the young man that was killed that night.

Q. But Chief, the photograph, you didn't take this photograph and say, man, that looks like, geez, a great photograph, let's go and try to find this guy?

A. No, sir.

*Q. No? So when we are talking about that in Court it's not to try to identify Kyvonte Eaglin; is it?*

*A. That's correct.*

Q. Okay. Your officer when he printed it from the Facebook, you said he printed it from the Facebook account; right?

A. The picture was given to me or shown to me by Deputy Chief Semmes. When they -- again, I'm getting briefed when something develops. I'm getting briefed as to what's going on and Deputy Chief Semmes is that liaison for me into the criminal case. So that was shown to me -- this picture was shown to me by Deputy Chief Semmes.

Q. So just to get right to the answer is that Semmes printed it from Facebook and gave it to you? Is that what you're saying?

21

A. I don't know if he personally printed it. I want to make sure I give you accurate information.

Q. Okay. Well, when you -- I assume that as a police officer you print stuff all the time from Facebook. You are familiar with it because that's part of your investigative tool is you can get all kinds of stuff off of Facebook; right?

A. Social media.

Q. Yeah. I mean, people can even open all kinds of accounts but when you print it, it has a date on it.

A. Yes.

Q. Is there a date on that one?

A. Are you asking if you can right click on a picture --

Q. It's a very simple question. Is there a date on that one?

A. There's not a date on it.

Q. So who took the date off?

A. I didn't know there ever was a date on it.

Q. If this is a print from Facebook there would be a date on it.

A. Not -- not true.

Q. No?

A. You can right click on a picture and download the picture straight to a photo.

Q. But if you're printing it direct from Facebook, there's a date on it; right?

A. If you do control print. But you can right click on a picture and print the picture directly.

Q. So if we are trying to get to the truth of what's going on in this case, wouldn't it make more sense to print a photograph with a date on it. So that way we can see whether or not this is something recent or this is a couple of kids four years ago with a plastic BB gun. Wouldn't that be kind of important?

A. I don't know how to answer that one.

22

Q. We're not really – we're not taking this picture and saying, hey, this is Kyvonte Eaglin. He's a really dangerous guy. He's holding a gun on a little kid about to shoot him in the back of the head. That's not the impression you want this jury to have; is it?

A. He's asking my opinion about this picture?

Q. I'm asking if --

A. I want to make sure I answer it -- I want to make sure I can answer it.

Q. If there's an objection then somebody will object. But if not, then you can answer the question.

A. The way that I viewed this picture –
. . . .

A. How someone views this would be their opinion of it. I don't have a high opinion of this no matter if this was four years ago, or yesterday. That is not a good act to take a picture of of [sic] what you're enacting. That's a very poor --

Q. So officer, are we trying to give the Jury the impression that Kyvonte Eaglin is a bad guy because he's -- whenever this was, would be holding a toy pistol? Is that what we are trying to depict? Or is that what we're trying to depict? Because we saw his statement and your own officer said, yeah, we know you. You're a good guy. You've never been in trouble before. So we're not saying that's not true, are you? You know that.

[Trial judge instructs the jury to disregard the last remark.]

Q. So Officer D'Albor, we saw the -- you saw the statement that was taken from Kyvonte; right?

A. I'm sorry. The what?

Q. You saw the statement that was taken from Kyvonte?

A. On video?

Q. Yes, you'd saw [sic] that.

A. Yes, sir.

Q. And you saw on the video the fact that he has never been in trouble before. You saw that; right?

A. As he said, yes.

23

Q. As he said?

A. Yes, sir.

Q. But, wait? So are we going to give the Jury the – you're not saying that he has been; are you?

A. No, I'm not.

Q. Okay. Well, then let's make that clear because that's what we're trying to do. So this photograph is not intended to say hey, we got something on this guy. Look at this. This is a crime. He's got a gun at the back of someone's head. That's not what you're trying to depict in this; is it?

A. If you're asking me of my opinion of what this picture depicts it doesn't make me thin[k] anything good.

Q. I'm asking you is that what you're trying to say with this photograph.

A. It was presented to me as have I seen this before: I'm not depicting anything.

Q. Okay.

A. If you're ask [sic] my opinion about the picture itself --

Q. How old are these kids in that photograph, do you know?

A. No, sir.

Q. Have you asked?

A. No, sir.

Q. Did you ask Kyvonte's mother?

A. No, sir.

Q. Did you ask her if she could go -- if she -- if the gun in that little photograph is a toy gun, a plastic BB pellet gun? Did you ask her that?

A. No, sir.

(Emphasis added.)

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence." La.Code Evid. art. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" La.Code Evid. art. 403. Evidence of a person's character or of a character trait is generally not admissible. La.Code Evid. art. 404(A). The trial court's ruling on the admissibility of photographs "will not be disturbed on appeal unless the prejudicial effect of the photographs, in fact, clearly outweighs the probative value." *State v. Lindsey*, 404 So.2d 466, 475 (La.1981).

In *State v. Coleman*, 14-402 (La. 2/26/16), 188 So.3d 174, *cert. denied*, __U.S.__, 137 S.Ct. 153 (2016), the defendant sought to admit photographs seized from his girlfriend's bedroom in her mother's trailer. The photos allegedly depicted the girlfriend's male African-American friends, who "were making lewd gestures or gang signs." *Id.* at 200.

A surveillance video admitted into evidence showed the girlfriend and a black male, whom the girlfriend's father identified as the defendant, unsuccessfully attempted to use a bank card at an ATM. *Id.* The defendant contended the man in the surveillance video could have been one of the girlfriend's friends shown in the photographs, which he sought to introduce into evidence. *Id.*

"[T]he trial court determined the risk of confusion, misleading the jury, and wasting time, outweighed any probative value the photos might have possessed." *Id.* at 200. The jury could use other evidence to determine whether the defendant was the man at the ATM. *Id.* Our supreme court noted, "Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible." *Id.* at 200. The court held the trial court did not err by excluding the "wholly irrelevant" photographs from evidence. *Id.* at 201.

Likewise, the defendant in *State v. Ockman*, an unpublished opinion bearing docket number 16-1615 (La.App. 1 Cir. 9/15/17), was charged with indecent behavior with juveniles. He attempted to admit three photographs into evidence at his trial. The photographs showed children sleeping or lying on a palette, a group of children on a golf cart, and a group of children, all smiling, seated around a table. The trial court found the photographs were not relevant to the crime for which the defendant was on trial. On appeal, the first circuit, citing *Coleman*, 188 So.3d at 197, believed:

> These photographs had very little, if any, evidentiary value. They established nothing more than that teenagers and children visited Defendant's home, assuming these were pictures of Defendant's home and property. This issue of many people "hanging out" at Defendant's house was conceded by every witness who addressed the issue and was contradicted by no one. The fundamental right to present a defense does not require the trial court to admit irrelevant evidence or evidence with such little probative value that it is substantially outweighed by other legitimate considerations.

*Ockman*, 16-1615 at p. 6.

Here, later testimony showed the photograph had nothing to do with the crime for which the defendant was tried. Latavius Stewart, the defendant's sixteen-year-old cousin, testified Exhibit S-2 was a photograph taken approximately four years earlier. He said he was the boy standing against the wall while the defendant held a BB gun which shot plastic BBs against his head. He said another cousin took the picture. Mr. Stewart said they were "[j]ust having fun with it. We were being silly. Just taking pictures."

The photograph was not reasonably useful in identifying the defendant at the scene of the crime. Exhibit S-2 does not indicate any particular features that would have allowed Chief D'Albor to identify the defendant. The photo shows a male younger than the defendant whose profile is mostly covered with a bandana. Nevertheless, when defense counsel argued Chief D'Albor "identified [Defendant]

26

by this photograph[,]" no one corrected the statement. The trial court did not allow defense counsel to question or cross-examine Chief D'Albor "in terms of the authentication because of his identification[.]"

This photograph, Exhibit S-2, provided no useful purpose at trial. Chief D'Albor's testimony did not show he relied on it at the scene to identify the defendant. Even if he had, it would still add nothing to help the jury reach a verdict. The photograph depicted nothing related to the crime for which the defendant was on trial. It did, however, present a disturbing image to the jury that portrayed the defendant as one who held a gun to a young boy's head. Only later in the trial did the jury hear testimony explaining the photograph, which in itself did not cast the defendant in a particularly good light.

Nevertheless, "[a]n error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error." *State v. Koon*, 96-1208, p. 9 (La. 5/20/97), 704 So.2d 756, 763, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 570 (1997). The harmless error analysis applies in instances where a photograph was erroneously admitted into evidence at trial. *State v. Teno*, 12-357 (La.App. 3 Cir. 11/7/12), 101 So.3d 1068, *writ denied*, 12-2652 (La. 5/17/13), 117 So.3d 510.

In *Teno*, 101 So.3d 1068, the defendant was charged with possession of a firearm by a felon, illegal use of weapons, and aggravated assault with a firearm. At trial, the State introduced a photograph of the defendant at a club with a gun in his waistband. A security guard testified he and others tried to escort him from the club, and "they had to wrestle him down." *Id.* at 1076. Another officer removed a loaded gun from the defendant's pocket, and the witness identified the defendant as the man who had the gun at the club. This court found the admission of the photograph into evidence was harmless error because other evidence, absent the

photograph of the defendant at the club, was sufficient to convict the defendant as charged.

Here, witness Ms. Neal testified that "a bunch of fussing" began between two groups at the party. She "grabbed [Defendant] and pushed it apart." The defendant's mouth was bleeding from the fight. Ms. Neal took the defendant to his vehicle. She described the defendant's demeanor as "[f]ear," and said, "He was pissed." However, she testified as she spoke to him, "He thought about it. He said okay. I said trouble is easy to get into. Think about it." She spoke to the defendant for fifteen minutes, and "he then backed down[.]" She saw a nine-millimeter gun on the passenger seat of the defendant's vehicle. Ms. Neal believed the defendant stayed at the party after that because his friends were there. Ms. Neal testified that the defendant went back inside, and another fight broke out between the defendant and the victim. She stated that it quickly turned into "a big hooray," and a crowd rushed outside. By the time Ms. Neal made it outside, she testified that the defendant had raised a gun and shot about five times. Ms. Neal stated the defendant then got in his vehicle and left the scene.

Ms. Neal said that Jermaine "Dutt" Washington was also at the scene. Ms. Neal said she saw him running toward his vehicle, parked on the same side of the building as the defendant's vehicle, after the shots were fired. Mr. Washington also had a gun, but she did not see what kind. Ms. Neal testified she saw him "right after maybe the fourth shot . . . ." However, she later testified she saw Mr. Washington run after all the shots were fired.

The initial shots Ms. Neal heard sounded like they came from a nine-millimeter firearm, and they were from the direction of the passenger side of the

28

defendant's vehicle.[6] Ms. Neal testified that she heard at least three other shots that sounded like they were from "[e]very bit of a .40 caliber." She said she could not determine the direction from which the .40 caliber shots came.

Ms. Neal said she could tell the first shot was coming from behind the building "when [Mr. Washington] ran out" from behind it. She said, "The second shot was when he was like maybe in the middle. The third shot is when he hit the street, and that was it. He ran to the truck after that, got in the truck and left." Ms. Neal's testimony was confusing when she stated, "No, [Mr. Washington] didn't fire a shot. He was running firing." She then testified she heard all the shots before Mr. Washington came out on the street.

Jashanna Drake testified someone "snuck" the defendant at the party.[7] She defined "snuck" as "hit him without looking – without him looking." She said a fight broke out, and a crowd went outside. The defendant "ran to his car and pulled his gun out." However, he "put the gun back inside the car[,]" and the crowd went back inside, where the fight broke out again among the same people. Jashanna testified she saw the defendant go to his vehicle again and get the gun. She said, "He pulled the gun out and started shooting." He was standing "by his car" with no one standing around him. She never saw the victim in the street. The defendant shot the gun "[l]ike four times." She heard no other gunshots.

Jashanna's testimony was very confusing and totally lacking in credibility. In her first statement to police, Jashanna said Mr. Washington shot the victim. In

---

[6]Ms. Neal was a lay witness who testified she had shot nine-millimeter and .40 caliber firearms and was familiar with the sounds they make. She stated, "my stepbrother was in the army, and I used to always go to the army base, and we would – he would shoot and show me different guns. That's the reason why I know so much about them." She was never qualified as an expert in any field, and no one made any objection to her testimony about her identification of the firearms based on the sounds they made.

[7]We refer to Jashanna Drake and Monteca Drake by their first names in an attempt to avoid confusion about the witnesses.

her second statement, she said the defendant shot him.  At trial, she said she did not see who shot the victim, but she did see the defendant shoot a gun.  Later in her testimony, however, she said her first statement was a lie, the second statement was not a lie, and her testimony that she did not see the defendant shoot the victim was a lie.  She then testified she lied in her second statement when she said the defendant accidentally pulled the trigger.  She said she did not see the defendant shoot the victim.  Still later, Jashanna testified the part of her second statement, where she said the defendant shot the gun to try to scare everyone, was true.[8]

Jashanna testified Mr. Washington was standing in front of the building, and he ran to his truck when the shots were fired.  She said she never saw Mr. Washington with a gun that night.  Jashanna explained she "was historical [sic]" when she gave her statements, and she said what she had heard on the street.  She said Mr. Washington came to her in April of 2016, showed her papers about what she had said, and asked her to change her story.  Jashanna testified that she then changed her statement.

Monteca Drake, Jashanna's cousin, also gave a statement to police about the incident.  She said at the party, someone tried to stop the victim from going after the defendant.  The victim was told not to go up to the defendant because the defendant had a gun, but the victim did not listen.  Monteca saw a fight "coming out of the building."  Everyone went back inside, but a second fight broke out, "and [Defendant] and [the victim] passed some words."  She testified the defendant was holding a gun in front of his body.  He pointed it "at the crowd, and he shot the first shot."  Monteca did not know "where the shot went, but he did shoot the first

---

[8]Chris Myers, an investigator with the District Attorney's office, testified outside the presence of the jury that he went to Jashanna's home to serve her with a subpoena in May of 2016.  He believed Jashanna had been threatened, and she did not want to come to court.

shot." Everyone started running, and Monteca heard someone yell the victim had been shot.

After police were called, Mr. Washington "got in the truck and hit the lights and stuck the gun out there and shot the last shot. But in between the first and the last shot, there were other shots fired." Monteca did not know who fired the other shots, and she did not know how many other shots were fired. She said she never saw Mr. Washington in the street.

Monteca saw the victim in the road before the defendant fired the shot, but she did not see him at the time of the shot. She did not see the victim near the defendant when the defendant shot. Chris Myers, the investigator for the District Attorney's office, testified he met with Monteca and Jashanna "pertaining to [their] safety." According to Mr. Myers, they "had got a couple of threats from some people or whatever dealing with the case[.]"

Shadavia Capdeville, the victim's cousin who was fourteen years old at the time of this incident, also attended the party. She saw "[a] couple of people" drinking alcohol, and said she smelled marijuana at the party. Ms. Capdeville described how a fight broke out inside the building, but she could not see what happened. Next, "everybody just ran outside[,]" including the people involved in the fight. Someone said everyone needed to calm down, and everyone went back inside. The group then went outside a second time. "[W]hen [the victim] went to punch [Defendant]," Ms. Capdeville said "it's like [Defendant] just shot him like that[,]" and she "just took off running." Ms. Capdeville said she heard two shots. She did not see who fired the first shot, but she saw the defendant fire the second one. The victim was running toward the defendant. She said he swung at the defendant when he was about four feet away, and the defendant shot him "when he was swinging." She testified she did not see the victim with a weapon.

31

Ms. Capdeville gave a statement to police in December of 2015. She reviewed that statement the day before she testified at trial. She recalled saying in the statement that the defendant got a gun from his car and shot it in the air to try to stop the fight. She also said another girl, Quiamie Randolph, tried to stop the victim from running up to the defendant. She said the defendant fired the first shot into the air as a warning shot, but the victim kept coming, with his fist up, ready to punch the defendant. As the victim came closer, the defendant "just shot him."

Jermaine Washington testified a fight broke out inside the building, but he did not see it. He then saw "[e]verybody rushing outside." The fight outside ended, "and then everybody went back in." Another fight broke out inside, and it was "[n]ot that long until everybody went back outside." Mr. Washington testified, "everywhere you looked somebody was fighting." Mr. Washington first watched the fighting from the sidewalk, but then he moved to his truck. As he was looking for his cousin, he heard a lot of gunshots. He was standing at the back of his truck, and the shots came from the direction of the "front toward the truck." He did not see anybody shooting a gun. Mr. Washington testified he heard the shot, opened the door of his truck, and fired one shot from a gun he had inside it. He testified he fired one shot in the air to make the people in front of the truck move. He said he shot only once, and he did not remember what kind of gun he had. He did not pick up his shell casing. Mr. Washington testified that later that night, he "threw [the gun]" when he went to Welsh. When asked why, he said, "'Cause I shot it." Mr. Washington took police to the spot where he said he threw it, but they never found the gun.

Mr. Washington pled guilty to a felony charge, "[i]llegal use of – discharge of a firearm," as a result of the incident. He was sentenced to one year at hard labor, but "they put it to home incarceration and two-year probation." He agreed

to testify at the defendant's trial as part of his plea agreement. Mr. Washington gave police a statement after the shooting. At trial, he first testified he did not recall telling them he had a nine-millimeter gun that night. However, he then said, "Yeah, I – I probably – yeah, I probably did tell them. Yeah, I probably did." At trial, he said he did not recall the caliber of the gun. He testified, "they kept asking me, so I just said a kind. They asked me – well, one of the officers said it was a 9mm, and I just said, yeah, just to say yeah."

Next, Mr. Washington explained he only had the gun "about a week, two weeks[,]" and he did not know what caliber it was. He had bought bullets for it, but he did not know what size. Mr. Washington testified he found the gun in Welsh; "[i]t was down the road." He said he was walking on the main road in Welsh around dark and came upon the gun in the grass. It had bullets in the clip. He purchased ammunition for the gun, but he did not recall what size he bought. Mr. Washington said he had never shot a gun before August 8, 2015. He did not see the defendant with a gun that night.

Taryke Jacobs testified a fight broke out at the party, and someone named "Dakota" started swinging at the group of people from Welsh. Ms. Neal grabbed the defendant and calmed him. When they all went back inside, the victim said something to the defendant, who started swinging and hit the victim, who swung back. They all went outside again. The fight outside ended only with the shooting.

Mr. Jacobs said he did not see who fired the shot. He knew the defendant had a gun, but Mr. Jacobs said it never left his car. When the shooting began, Mr. Jacobs heard one shot. He "took off running. Then [he] heard several more." Mr. Jacobs indicated the direction from which the first shot came, but it is not described in the record other than "from over here . . . ." The other shots came from "[t]he same spot." When Mr. Jacobs and two others were standing in the

street, he said the defendant was "kind of in front" of them. Then they heard the first shot. Mr. Jacobs said he testified, "I take off running, and all I see is him coming flying in his car. So he took off running to his car and drove off." Mr. Jacobs said, "during the gunshots, [Defendant] was running to his car." When the defendant was standing next to Mr. Jacobs, he did not have a gun. Mr. Jacobs had seen the defendant with a gun before, at his house. He believed it was the same gun he saw that night.

He testified the defendant was upset after the first fight, with tears and red eyes. Mr. Jacobs said he looked like "[h]e was angry." Later that night, the defendant and four others picked up Mr. Jacobs in the defendant's car as Mr. Jacobs ran on Highway 90 toward Crowley. Mr. Jacobs asked the defendant to drop him off, and he hid in the bushes until his sister picked him up. A number of people, including Jashanna and Monteca Drake, called Mr. Jacobs about what happened. They suggested Mr. Washington had fired shots. Mr. Jacobs gave two statements to police; in his second statement, he said he saw Dakota Chaisson with a gun. Mr. Jacobs told police Mr. Chaisson, two boys from Lafayette, and twins Monteca and Teca Drake were walking in the middle of the street with a gun. He did not see anyone shoot a gun that night. Mr. Jacobs knew the defendant did not carry a gun "when he go [sic] to work and stuff." When asked if the defendant used the gun more for protection, Mr. Jacobs responded, "If that's what you want to call it."

Quiamie Randolph testified the defendant was like her brother, and the victim was her cousin. Ms. Randolph's mother and the defendant's father have children together. She went to the party that night with Ms. Capdeville and Tyranniee Withers. She said a fight broke out when the defendant hit the victim

34

from behind. The fight began inside and moved outside, where Ms. Neal broke it up. Other fights were taking place outside at the same time.

Ms. Randolph testified she was standing with the victim when the defendant was "[s]tanding by his car door." She saw the defendant with a handgun "[b]y his lower waist[,]" facing toward her and the victim. Ms. Randolph testified, "[the victim] went up to [Defendant], and as he swung at [Defendant], the gun went off." She said the victim ran toward the defendant and swung at him. The gun went off when the victim hit the defendant. She said the victim had no weapons on him.

Ms. Randolph said she only heard one shot from the defendant's gun. She first said she did not know if the defendant's gun actually touched the victim, but then she said it did. About two minutes later, "[o]ther guns went off[,]" and she heard other shots. She could not determine the direction from which they came. Ms. Randolph gave three statements to police; in one of them, she said the gun came "very close" to touching the victim. Ms. Randolph said she did not want to testify "because [she] didn't want to see [Defendant] go away."

Chief D'Albor testified he spoke primarily with Ms. Neal at the scene, and he determined the defendant was a suspect. Ms. Neal showed Chief D'Albor the defendant's Facebook site as discussed above. The defendant was picked up in Welsh about an hour later and taken to the criminal investigation division.

Chief D'Albor and Deputy Chief Danny Semmes conducted a recorded interview of the defendant on August 7, 2015, and it was played to the jury. The defendant said he and his friends were enjoying themselves at the party until Dakota Chaisson and the victim arrived. Mr. Chaisson "snuck" him, and a fight broke out with "everybody on top" of the defendant. Everyone ran outside, where everybody was on top of the defendant again. The defendant said the victim was

one of the people who jumped on the defendant. The defendant said the fight took place in the middle of the road in front of the hall.

The defendant said he heard multiple gunshots from more than one gun, but he did not know the direction from which they came. He said he ran to his car and left. The defendant originally said he did not own a gun, and he did not have a gun that night. The defendant told the police that he had never been in trouble before.

Police told the defendant someone was hit by a bullet and was at the hospital being treated. The defendant again said he was telling them everything that happened. He did not shoot, and he did not know who shot. He said he did not have a gun in his hands.

Later in the interview, the defendant admitted he did have a gun, but he said he did not fire it. He said the gun was in the glove box of his car, which was parked near the hall. The defendant had gotten the gun from his deceased uncle, and he did not know what kind of gun it was. He said he had never fired it. The defendant told police he threw the gun out of the right side of his vehicle into a gully near a church. It was not loaded. The defendant had spoken to his mother on the phone, and she said the police were at their home saying he had shot someone. He threw the gun away because he was nervous about the situation.

The defendant finally admitted he shot his gun in the air one time. Police told the defendant they had found a bullet and casings from a nine-millimeter firearm. The defendant repeatedly, until the end of the interview, insisted he shot only once, and it was into the air. He said he had only one bullet in the gun.

The defendant said Jermaine Washington, "Dutt," was one of the friends who came to the defendant's defense during the fight. Police told the defendant Mr. Washington also had a gun at the scene, but the defendant said he did not know anything about it.

36

During a second interview later the same morning, police told the defendant they would search the gully for the gun. The defendant still insisted he shot only once in the air. Police told the defendant the victim was dead and finding the gun would help the defendant if he was telling the truth. The defendant told the police that he had thrown the gun into the water. They explained multiple casings and one live round were found near the defendant's car, along with a projectile they believed passed through the victim's body. They told the defendant Dutt had said the defendant was not shooting in the air.

The defendant said the victim was hitting the defendant when he was shot. The defendant claimed he raised his gun in the air as the victim hit him. When the defendant heard other shots, he got in his car and left. He told police he was defending himself. He took the gun to the party so he could defend himself if something happened. He did not plan to shoot it until they jumped on him; he again said he shot in the air.

Chief D'Albor testified that his department, with the assistance of the Calcasieu Parish Sheriff's Department dive team, searched the coulee for the defendant's gun. The defendant went with them to show where he had thrown it. Accoding to Chief D'Albor, they never found the gun.

Chief D'Albor further testified that Jennings police had "dealt with [Dakota Chaisson] on other cases." He said that Mr. Chaisson was a member of a group known as DBE, or Dope Boy Entertainment.[9] When asked whether police investigated and identified members of the DBE, Chief D'Albor responded, "My investigators would gather intelligence and people that are suspected to be

---

[9]An earlier court reporter had transcribed the testimony as "Dope Boy Entertainment." However, during the trial, a different reporter took over, and she transcribed the testimony as "Dough Boy Entertainment." Based on the total context of the various testimony, the correct name is "Dope Boy Entertainment."

involved in any criminal activity, whether it's an initialed name or any other, we are going to gather intelligence on anybody that's committing crimes or potentially committing crimes."

Officer Richard Geiger testified as a detective with the Jennings Police Department. He took a number of photographs admitted into evidence and explained those photographs at trial.[10] One of the photographs showed a bullet casing found near a vehicle in front of a building.[11] A live round and a nine-millimeter spent casing were also found in the same area, in front of the building, along with a blood spot. A slug with blood on it was found across the street from the casings and the live round. A blood trail began in the area near where the live round and the spent nine-millimeter casings were found.

Three spent .40 caliber casings were found at the end of an alley adjacent to the building. A blood trail began near the point where the spent nine-millimeter casings were found and continued down and across the street to where the victim's body was found. Officer Geiger testified a nine-millimeter gun would eject casings to the right and back most of the time.

Caitlyn Traylor of the Louisiana State Police Crime Lab testified as an expert in forensic serology. She examined a nine-millimeter bullet admitted into evidence as Exhibit C-5 and determined it had suspected blood on it. DNA analyst Stacy Williams of the State Police Crime Lab tested a swab of the suspected blood from the bullet and reference samples from both the victim and the defendant. She found the blood from the nine-millimeter bullet matched the DNA profile from the

---

[10]A DVD containing photographs of the crime scene was admitted into evidence as Exhibit S-4.

[11]Based on the overall trial testimony, the American Legion building is shown at the bottom of Exhibit S-7 to the right of the large grassy area. The .40 caliber casings were found in the rear of the alley to the right of the American Legion building, and the vehicle operated by Defendant, very near where the nine-millimeter casings were found, was parked in front of the building to the right of the alley, all as shown in Exhibit S-7.

victim's reference sample. She did not test any of the casings for DNA. As discussed in earlier assignments of error, Michelle Cazes, the firearms analysis expert from the crime lab, determined "there was [sic] obviously two firearms" at the scene, a nine-millimeter and a .40 caliber. She later agreed to the possibility of three guns being present.

Two nine-millimeter cartridge casings and a jacketed hollow-point cartridge, found on Market Street, were fired from the same gun. Three .40 caliber cartridge cases, collected from behind the alley of Market Street, were "fired from the same unknown Glock or Glock-type firearm." Ms. Cazes could not say whether the bullet fragment marked as Exhibit C-5 was fired from the same gun as the casings because she had no gun from which any of them were fired.

Calcasieu Parish Coroner, Dr. Terry Welke, determined the cause of the victim's death was a gunshot wound to the trunk that entered the front of the chest and exited on the right upper back with a downward trajectory. The wound was consistent with the end of the barrel being less than two feet from the victim at the time of discharge of the weapon. "[I]t was not a contact gunshot wound." The victim's blood tests showed the presence of methamphetamine and marijuana. Dr. Welke found no evidence of the victim being struck in the back of the head.

In summary, Exhibit S-2 was totally irrelevant to this case. It was highly prejudicial, and the prejudice outweighed any probative value it could have had. Indeed, the photograph had no probative value, and it should not have been admitted into evidence.

However, this erroneous introduction of evidence is not reversible error if it is found to be a harmless error. The defendant lied in his statement to police when he said he did not have a gun and later when he said he had one but he left it in his car. When he did admit to shooting the gun, he insisted he shot it only once into

39

the air. The defendant's credibility was certainly an issue at trial because of his multiple stories about what he did that night.

However, the credibility of multiple witnesses to the shooting was also an issue. Jashanna Drake's testimony was extremely confusing, and even her testimony about what was a lie and what was the truth was inconsistent. Monteca Drake testified she saw the defendant fire the first shot, but she did not see the victim near the defendant when he fired. Jashanna and Monteca called Taryke Jacobs to suggest the defendant had fired shots. Jashanna and Monteca may have been threatened with regard to their testimony. Shadavia Capdeville told police the defendant shot in the air, but she testified at trial the defendant shot the victim.

Jashanna Drake's testimony is so inconsistent it cannot be relied on for establishing any fact. Although Mr. Jacobs testified the defendant's gun never left the car and he did not see who fired shots, no less than four eyewitnesses testified that they either saw the defendant shoot the victim or shoot in his direction. There was consistent testimony regarding the fight that preceded the shooting that was sufficient to convict the defendant of manslaughter. The trial court's error in admitting the prejudicial photograph, Exhibit S-2, is, therefore harmless.

### ASSIGNMENT OF ERROR NUMBER EIGHT

The defendant argues the trial court erred by refusing to allow him to present eyewitness testimony that the defendant appeared to have accidentally fired a shot at the victim. He contends the omission of this evidence deprived him of his constitutional right to present a defense.

The state's counsel advised the trial court he would object if defense counsel tried to elicit an opinion from Ms. Capdeville about whether the shooting was accidental or intentional. In fact, defense counsel attempted three times to ask Ms. Capdeville whether the defendant was protecting himself from the victim when he

fired the second shot. The state's counsel objected all three times, and the trial court sustained all the objections. The trial court instructed defense counsel not to comment on the evidence and not to ask Ms. Capdeville for her opinion. Defense counsel then, in spite of the court's instructions, asked Ms. Capdeville, "But it looked like an accident to you, didn't it?" The state's counsel's objected a fourth time, and the trial court again instructed defense counsel it would not allow Ms. Capdeville to give her opinion about whether the shooting was accidental or intentional. A lay witness may testify about her "opinions or inferences which are: (1) Rationally based on the perception of the witness; and (2) Helpful to a clear understanding of h[er] testimony or the determination of a fact in issue." La.Code Evid. art. 701. Further:

> Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.

La.Code Evid. art. 704. Testimony of a lay witness that "constitutes a natural inference from what was observed" is not prohibited "as long as the lay witness states the observed facts as well." *State v. LeBlanc*, 05-885, p. 7 (La.App. 1 Cir. 2/10/06), 928 So.2d 599, 603. On appeal:

> A reviewing court must ask two pertinent questions to determine whether the trial court properly allowed lay opinion testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness's observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error.

*Id.*

In *State v. Higgins*, 03-1980 (La. 4/1/05), 898 So.2d 1219, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005), a witness testified she personally observed a heated discussion between the victim and the defendant while standing four to six

feet away from them. Based on that interaction, she testified a robbery was taking place. The supreme court found that observation could have been rationally based on her perception of what she saw. Thus, the trial court did not abuse its discretion in allowing her testimony. The court noted "the credibility and reliability of such testimony, once admitted, was still within the province of the reasonable juror." *Id.* at 1234.

The converse of the rule of *LeBlanc*, 928 So.2d 599, is also true, that testimony erroneously omitted must also result in such prejudice as to constitute reversible error. Here, the jury heard Ms. Capdeville describe how the defendant held the gun and how he shot it in the air and then brought it down as the victim rushed toward him. She actually left the witness stand to demonstrate the distance between the victim and the defendant. She left the stand again to show how she saw the victim running toward the defendant and swinging at him. The trial court has broad discretion in evidentiary rulings. *Graves v. Riverwood Int'l Corp.*, 41,810 (La.App. 2 Cir. 1/31/07), 949 So.2d 576, *writ denied,* 07-630 (La. 5/4/07), 956 So.2d 621. This court should not disturb those rulings "absent a clear abuse of that discretion." *Id.* at 581.

Ms. Capdeville's testimony fairly portrayed what she saw in a manner that allowed the jury to form its own opinion about the issue. The jury had the facts Ms. Capdeville's testimony portrayed. Defense counsel told the trial court he was "asking her what she saw." The trial court ruled Ms. Capdeville could say what she saw, but she could not give her opinion. The jury heard Ms. Capdeville's objective testimony about the facts she observed. Whether those facts established that the shooting was accidental or intentional was for the jury to decide. The defendant was not prejudiced by the exclusion of Ms. Capdeville's opinion.

The defendant offered a proffer of Ms. Capdeville's testimony outside the presence of the jury. He contends, however, the entirety of the proffer was not transcribed. According to the defendant, a list of witnesses who would have testified they saw an accidental shot was omitted from the record. The defendant, however, made no request in the trial court to supplement the record with what was supposedly omitted from his proffer. This court may not consider any issue based on an allegedly incomplete record because that allegation was not addressed in the trial court. La.Code Crim.P. art. 841.

Additionally, the defendant complains about comments the state made during its closing argument about his recorded statement being the only evidence the jury heard of an accidental shooting. The defendant failed to object when the state's counsel made that argument. Thus, he did not preserve that argument for appeal, and this court may not consider it. Uniform Rules—Courts of Appeal, Rule 1-3.

## ASSIGNMENT OF ERROR NUMBER NINE

The defendant argues the trial court erred by refusing to allow him to impeach the state's witnesses with prior inconsistent statements about how the shooting occurred. According to the defendant, "some witnesses" changed their stories at trial about whether the shooting was an accident. However, the defendant did not identify those witnesses, indicate where their testimony could be found in the record, or point out how their testimony was inconsistent with any prior statements.

An argument not briefed on appeal is deemed abandoned, and this court will not consider it. Uniform Rules—Courts of Appeal, Rule 2-12.4(B)(4). This court cannot, based on the defendant's argument, determine which witnesses he argues changed their stories at trial or what changes from prior statements they made. The

43

defendant's vague statement that witnesses changed their stories and the trial court erred by not allowing him to question them about the discrepancies is an abandonment of the argument that he should have been allowed to impeach that testimony.

**ASSIGNMENT OF ERROR NUMBER TEN**

The defendant contends the trial court erred in denying his motion for new trial without a hearing. He again refers this court to his filings in the trial court regarding his motion and the grounds for it. As set out in earlier assignments of error, this type of reference is insufficient to set out an argument on appeal. Uniform Rules—Courts of Appeal, Rule 2-12.4; *Theriot*, 691 So.2d 213.

The defendant does state he filed the motion for new trial partly because the trial court left the courtroom and did not hear proffered evidence about whether the shooting was accidental and because the state's firearms expert said she could test casings for fingerprints but had not been asked to do so. He states:

> There is no indication in the court's denial of the defendant's motion for new trial that he ever saw, heard, or evaluated the defense proffer, and the court now has the benefit of hindsight on the firearms expert issue. Those are reasons enough to [at] least have a hearing on the defendant's motion, and it is an abuse of discretion not to schedule that hearing, and not to grant a new trial for those reasons.

Defense counsel described the proffer of Ms. Capdeville's excluded testimony:

> This witness had she been allowed to testify under – under cross-examination would have admitted that – she said that the second – she would have said that the second shot was, quote, like an accident. She would have said she saw the defendant. He was shooting in the air and that she is not going to lie. It was like an accident. She would have said that the alleged victim was running at the defendant. The defendant was shooting in the air. She would have said I guess to scare him, and that's when I'm guessing he slipped and shot him.

The trial court shall grant a motion for new trial when "[t]he court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error." La.Code Crim.P. art. 851(B)(2). As discussed in Assignment of Error Number Eight above, the trial court did not err in excluding Ms. Capdeville's testimony that the shooting was accidental. Thus, the defendant has not shown prejudicial error regarding the proffered testimony.

The defendant further seeks a new trial based on issues involving the firearms expert testimony. As discussed in Assignments of Error Numbers One through Four, the trial court did not err in its rulings concerning the firearms/expert issues, or counsel failed to present an argument showing any error. The defendant has not shown prejudicial error by the trial court regarding those issues, and no basis for a new trial exists.

### ASSIGNMENT OF ERROR NUMBER ELEVEN

The defendant contends the trial court erred by failing to properly consider mitigating factors and imposed an excessive sentence. The trial court issued reasons for sentencing on January 30, 2017, which detailed the reasons for the imposition of the defendant's twenty-year sentence. The trial court found the defendant's age and the fact he was a first felony offender to be the only mitigating factors.

The trial court noted the defendant's Pre-Sentence Investigation report (PSI) showed he was born on July 27, 1998. He graduated from Welsh High School in May of 2016, and he participated in football and track. He was employed as a helper at Thornwell Warehouse for four months in 2015. The defendant had no juvenile or adult criminal history. The PSI also stated witnesses said the defendant fought with the victim prior to the shooting. The defendant initially denied having a gun, but he later admitted he had a gun, shot it, left the scene, and disposed of the

45

gun. Direct review of the PSI itself confirms the defendant had no juvenile or adult criminal history. He was the oldest child of a single mother, and he knew little of his father. The defendant's mother married about six years prior to the shooting, and the family had a good relationship. The defendant graduated from high school with a 3.4 grade point average, and he excelled at football and track. He hoped to receive a football scholarship and begin college in the fall of 2017. The defendant worked for four months. He had to quit that employment at the Welsh/Thornwell warehouse, his only job, because of football practice. At the time of the shooting, the defendant had just turned seventeen and was about to begin his senior year of high school.

According to testimony elicited at trial, the gun involved in the shooting had belonged to the defendant's deceased uncle. The defendant's grandmother had let him take the gun, but he was supposed to return it. He still had possession of it on the night of the shooting.

The defendant particularly contends the trial court erred in sentencing him because of the following:

1. It considered his age at the time of sentencing, not his age at the time of the offense.

2. The trial court failed to consider this was the defendant's first criminal offense ever, not merely his first felony offense, and

3. The trial court did not let defense counsel make any statement or argument about sentencing, but the victim's mother was allowed to read a statement without being cross-examined. The defendant argues the trial court did not explain why it did not consider the mitigating factors he set out in his motion to reconsider his sentence.

This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, ' 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To

46

constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted).

The defendant was exposed to a sentence of zero to forty years for his conviction for manslaughter, and he was sentenced to twenty years at hard labor. La.R.S. 14:31. Thus, he received a midrange sentence.

Even though a penalty falls within the statutory sentencing range, it may still be unconstitutionally excessive:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted). "While the trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1, the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983) (citing *State v. Ray*, 423 So.2d 1116 (La.1982); *State v. Keeney*, 422 So.2d 1144 (La.1982); *State v. Duncan*, 420 So.2d 1105 (La.1982)). "The

47

appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." La.Code Crim.P. art. 881.4(D).

The defendant called a number of character witnesses at his sentencing hearing. Kade Kelly testified at the sentencing hearing that she had taught the defendant in the fourth and fifth grades and in two years of high school. She taught the defendant French II and English IV while he was in jail awaiting trial. The defendant obtained his high school diploma and graduated with a 3.4 grade point average while he was in jail. Ms. Kelly testified the defendant had "always been a good kid" who helped other students.

Jamie Festervand taught the defendant during summer school remediation when he came into high school. The defendant also voluntarily came to a class that was not required to get extra help on his LEAP test. He was serious about school and was always prepared for class. She also taught the defendant during his junior year. The defendant and his friends talked to Ms. Festervand about racial issues, his home life, what people in society could do better, and dogs.

The defendant liked dogs, and Ms. Festervand worked in dog rescue. She brought the defendant and his friends into her home, where she did not allow many people, to "love on the dogs and talk to them." The defendant never showed any anger or violence to her. Ms. Festervand described the defendant as "[a] very good kid."

Amy Stanford taught the defendant in her Fine Arts Survey, a college prep class, during his junior year. She said the defendant was "never one to look for trouble," and "he was always very polite." Although mischievous, he was never malicious, and he was "most certainly not a kid to get in trouble and to go looking for trouble." She still saw him as someone with potential.

48

John Richardson coached the defendant in football. He saw the defendant "behind the scenes . . . helping the younger guys out." The defendant "was just a good team player" who "never wanted attention" for helping others. Coach Richardson believed the defendant "has a good heart and . . . has it in him to make something of himself."

Yvette Derouen worked at Thornwell Warehouse, where the defendant brought his dogs to get them food, wormer, and shots during his sophomore year. The defendant and two of his friends were later hired for summer part-time jobs at the warehouse. She said the defendant was a "[v]ery good worker" who "[n]ever cut up like the other ones" and was "always straight." He was "like a son" to Ms. Derouen. She could not believe the news when she heard of the incident; she thought the defendant was "too loving and gentle." She said that she thought "they [were] naming the wrong person." Ms. Derouen said she would hire him again if the defendant could come back to work.

The defendant's mother described him as "a loving kid" who helped her with his younger brothers, who looked up to him and respected him. The defendant had never been in trouble and was a good student.

The trial court heard this testimony and also reviewed letters from Pat Deshotel, the former Welsh High School principal, and Mary Owens, the defendant's grandmother. It considered the defendant's age by citing his date of birth, his high school graduation, his participation in sports, his employment, and his lack of juvenile and adult criminal history. It also noted the defendant and the victim fought prior to the shooting, and the defendant initially denied having a gun at the scene. The defendant also later admitted to possessing the gun, shooting it, leaving the scene, and disposing of the weapon.

Despite the positive testimony at sentencing, the trial court noted the defendant "brought a gun to a fist fight," where he "had plenty of opportunities to recede." The trial court stated he could find no other mitigating factors than the defendant's age of eighteen and the fact this was his first felony conviction. After the trial court pronounced a sentence of twenty years at hard labor, defense counsel argued provocation was a mitigating factor, and the defendant was unlikely to commit another crime. The shooting "happened without any planning or purpose" and "happened quickly and without any forethought and likely it was an accidental [discharge] of a firearm during the swiftly moving sequence of events." Defense counsel believed the trial court should consider the proffered evidence of an accidental shooting for sentencing purposes.

In *State v. Frazier*, 14-1132 (La.App. 3 Cir. 3/4/15), 157 So.3d 1266, *writ denied*, 15-657 (La. 2/26/16), 187 So.3d 467, the defendant stabbed and killed an apartment complex neighbor during an altercation. He was indicted for second degree murder, but the jury found him guilty of manslaughter. The trial court sentenced him to twenty years at hard labor. The defendant and witnesses on his behalf testified at the sentencing hearing, where the defendant expressed remorse and said he never wanted to hurt or fight the victim. Witnesses testified he was a good man. "Nevertheless, the trial court noted Defendant was caught up in anger at the time of the stabbing, and that anger led to the victim's death." *Id.* at 1276. The trial court indicated it had considered some of the guidelines of La.Code Crim.P. art. 894.1, including the defendant's prior record of only one drug charge and the fact he had fled the scene of the incident, leaving the victim to die. Further, the jury had found the defendant was the aggressor in the incident. This court affirmed the sentence on appeal.

50

In *State v. Dukes*, 10-1455 (La.App. 3 Cir. 6/1/11), 66 So.3d 598, *writ denied*, 11-1368 (La. 12/16/11), 76 So.3d 1199, a disagreement between the victim and the defendant led to pushing and shoving. The defendant followed the victim into the bathroom, and a knife fight ensued. The victim sustained two equally fatal stab wounds and a number of defensive wounds. The defendant left, and the victim died shortly thereafter on the bathroom floor. This court affirmed the defendant's twenty-five-year sentence.

A bystander in a bar was shot and killed during an altercation among three men in *State v. McGhee*, 10-583 (La.App. 3 Cir. 12/8/10), 52 So.3d 318, *writ denied*, 11-62 (La. 5/20/11), 63 So.3d 973. Evidence showed the jury believed the defendant pulled the gun from beneath his shirt. During a struggle, it fired and struck the victim. The defendant, who had a prior conviction for possession of cocaine, received the maximum sentence of forty years at hard labor.

The defendant in *State v. Edwards*, 12-933 (La.App. 3 Cir. 3/6/13), 129 So.3d 104, *writ denied,* 13-761 (La. 11/1/13), 125 So.3d 418, pled guilty to manslaughter for the shooting death of a man with whom he had argued all evening about a handgun. This court noted the defendant was highly intoxicated and angry with the victim at the time of the shooting. Witnesses said they had never seen the defendant as angry as he was that night. While he expressed remorse for the killing, he also left his friend to die, went to a store to buy beer and cigarettes, and went to a house where he was found asleep. The defendant had a prior drug conviction, a rejected charge for aggravated burglary, and a cocaine possession charge that was dismissed in exchange for his guilty plea to manslaughter. Family and church members submitted letters about what a kind, gentle man the defendant was. This court affirmed the defendant's twenty-five-year sentence.

Here, the jury rejected the charge of second degree murder, a crime that requires the specific intent to kill, and found the defendant guilty of manslaughter, a crime that considers provocation. The defendant argued the trial court failed to consider provocation as a mitigating factor in sentencing. The provocation that accounts for "sudden passion or heat of blood" is one element that distinguishes manslaughter from the greater offense of second degree murder. La.R.S. 14:30.1 and 14:31. It is the element that limits the defendant's possible sentence to forty years at hard labor as opposed to life imprisonment.

The trial court did refer to the defendant being eighteen years old, his age at sentencing and not at the time of the offense. However, the trial court presided over the entirety of this case. It was aware of the defendant's age at the time of the offense. Counsel did not identify how the difference in age should have affected the sentence imposed. The difference between age seventeen and age eighteen, particularly considering the defendant's lack of criminal history, does not provide significant reason to alter his twenty-year sentence.

Even though the trial court commented this was the defendant's first felony offense, he also indicated he had read the PSI, which indicated the defendant's complete lack of juvenile and adult prior criminal history, not just the lack of felony history. Although the trial court did not offer defense counsel the opportunity to make an argument prior to imposing the sentence, counsel argued for a reduced sentence after the trial court pronounced the twenty-year sentence. Nothing prohibited the trial court from amending the sentence after hearing that argument. Counsel's argument added nothing to the facts the trial court already knew, and his appellate brief does not indicate anything he would have argued to impact the length of the sentence imposed. Counsel's brief does not identify

52

anything he would have brought out during cross-examination of the victim's mother that would have changed the sentence.

This is a tragic case for everyone involved on both sides. One life is ended, and another life and two families are ruined because of what happened that night. As in many cases, the thought of the defendant, a person of young age, spending twenty years in prison is horrible. However, as the trial court noted, the defendant "brought a gun to a fist fight," and now, another young man with a lot of potential is dead. Our law provides and requires punishment in these circumstances. Based on the facts of this case, we find the defendant's mid-range, twenty-year sentence is not excessive.

## CONCLUSION

The defendant's conviction and sentence are affirmed.

**AFFIRMED.**

**Cooks, J. dissents.**

The majority admits the inflammatory photograph of Defendant holding a gun to another juvenile's head "provided no useful purpose at trial . . . add[ed] nothing to help the jury reach a verdict [and] depicted nothing related to the crime for which Defendant was on trial." Thus, the majority concludes: "**Exhibit S-2 was totally irrelevant to this case. It was highly prejudicial, and the prejudice outweighed any probative value it could have had. Indeed, the photograph had no probative value**, **and it should not have been admitted into evidence**" (emphasis added). I wholeheartedly agree. Despite these findings, however, the majority holds the admission of this evidence was harmless error because, it says, this evidence was "'unimportant in relation to the whole and the verdict rendered was surely unattributable to the error.'" The majority reaches this conclusion despite recounting the conflicting testimony of numerous witnesses. It concludes Defendant's contradictory admissions before trial and his testimony at trial made his credibility an issue and further recognized that "the credibility of multiple witnesses to the shooting was also an issue." But these findings are precisely why the majority's holding is not consistent with the jurisprudential test to determine whether the erroneous admission of this evidence was harmless error. It was not. In addition to the problems with the many witnesses' contradictory testimony, the State's expert, Ms. Cazes, could only conclude from her analysis of the evidence that two or three weapons *could have* been fired at the scene. Neither the Defendant's nor one other shooter's gun was recovered. Ms. Cazes could not determine if the one bullet that had the victim's blood on it was fired from any particular gun, only that it was fired from a nine-millimeter firearm. She could not say whether this bullet inflicted the fatal wound. Both Defendant and Jermaine Washington had nine-millimeter guns and the evidence shows that both fired their weapon the night the victim was shot. She also testified that no testing for

fingerprints was performed on any of the bullet casings found at the scene. Although the State proceeded with this case asserting Defendant committed second degree murder, by the close of trial the State asked the jury to return a verdict of manslaughter.

The law regarding the inadmissibility of evidence of a defendant's bad character, offered only to show he has bad character, is well settled and is based on the "underlying rationale . . . that the prejudicial tendency of such evidence outweighs its probative value, since the finder of fact is likely to convict because Defendant is a 'bad person' [rather than on] the strength of evidence against him in the case being tried." *State v. Langston*, 43,923 pp. 19-20 (La.App. 2 Cir. 2/25/09) 3 So.3d 707, 719, *writ denied*, 09-0696 (La. 12/11/09), 23 So.3d 912 (citations omitted). "The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is, and has been, such evidence is not admissible to prove the accused committed the charged crime because he has committed other such crimes in the past or to show the probability he committed the crime in question because he is a man of criminal character." *State v. Garcia*, 09-1578 p. 38 (La.11/16/13) 108 So.3d 1, 53. When such evidence is erroneously admitted the reviewing court must determine whether or not the error is harmless under the particular facts of the case:

The test for determining harmless error is whether the reviewing court may conclude that the error **was harmless beyond a reasonable doubt**, *State v. Casey,* 99–0023 (La.1/26/00), 775 So.2d 1022, *cert denied,* 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000), or "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana, supra.* **The remedy for erroneous admission of evidence, where there is reasonable doubt that such evidence was not harmless, is reversal of the defendant's conviction.** *State v. Foret,* 628 So.2d 1116 (La.1993). A trial court's decision regarding admissibility of the

evidence should not be overturned absent a clear abuse of discretion. *State v. Mosby,* 595 So.2d 1135 (La.1992).

*State v. Langston*, 43,923 pp. 21-22 (La.App. 2 Cir. 2/25/09), 3 So.3d 707, 720, *writ denied*, 09-696 (La. 12/11/09), 23 So.3d 912 (emphasis added).

The Louisiana State Supreme Court in *Foret* stated the test with even greater clarity: "When considering the erroneous admission of evidence, this court has set out the test to be 'whether there is a **reasonable possibility that the evidence might have contributed to the verdict,** and **whether the reviewing court is prepared to state beyond a reasonable doubt that it did not**.' *State v. Walters,* 523 So.2d 811 (La.1988)." *Foret*, 628 So. 2d at 1130. I believe the evidence in this case shows there is more than a "reasonable possibility" that this very inflammatory photo of Defendant greatly contributed to the verdict and thus denied Defendant his constitutional right to a fair trial. Even the trial judge admitted the photo was very inflammatory but nevertheless admitted it when he should not have done so. Defendant's conviction must be overturned and the case remanded for a new trial. Defendant was deprived of his constitutional right to a fair trial and justice requires no less.

A review of the evidence, which the majority acknowledges is problematic, convinces me that one cannot say "beyond a reasonable doubt" that this admittedly inflammatory, irrelevant, highly prejudicial, non-probative evidence "might have contributed to the [guilty] verdict." *Id.* From the very outset of the investigation the objectionable photo appears to have played a pivotal role in pointing the finger of blame at Defendant. After Chief D'Albor was shown the facebook photo of Defendant at the scene on a witnesses' cell phone he focused on Defendant as the possible shooter despite information from several witnesses at the time that pointed to another suspect, Jermaine Washington. The police later questioned Washington and

ultimately the State accepted his guilty plea of illegal discharge of a firearm. He was sentenced to one year at hard labor but was placed on home incarceration and two years of probation. Washington's testimony at trial was not helpful to the State's case but was favorable to Defendant. He testified he did not see Defendant with a gun the night of the shooting. Nevertheless, Defendant was convicted of manslaughter and received twenty years at hard labor.

Washington testified he too, had a gun at the scene, but said he fired only one shot in the air and claimed at trial he could not remember what kind of gun he had. Defendant also claimed he only fired a shot in the air to scare the angry crowd. Several witnesses corroborated his testimony. Washington said he did not pick up the spent shell casing from his gun and that he threw the gun away on his way to Welsh, Louisiana. He explained he disposed of the gun "Cause I shot it." He took police to the site where he says he disposed of the gun but it was never recovered. Likewise, Defendant showed police where he disposed of his gun and it too, was never recovered.

In his pre-trial statement to police when he was interviewed on the morning of the shooting he said the gun was a nine-millimeter.

Q. What kind of gun was it?

A. A 9.

Q. A 9 millimeter?

A. Yes.

At trial, he testified he just said it was nine-millimeter because the officer kept asking him what was the caliber of his gun and he just said "yeah" when asked if it was a nine-millimeter. He further admitted in his testimony at trial he purchased ammunition for the gun but claimed he did not recall the size. He also claimed he found the gun on the side of the road in Welsh when he came upon it while walking in the dark and that there were bullets in the clip when he found the gun.

The evidence shows that no casings were found in the area at the scene of the shooting where Washington says he fired his gun. According to the expert at trial, a nine-millimeter casing ejects to the right and back of a person firing the gun. *If* the victim was shot with a nine-millimeter, the location of the spent nine-millimeter casing places the shooter at the same location witnesses put Washington that night when the victim was shot.

In addition to Washington's testimony that he did not see Defendant with a gun in his possession at the time of the shooting another witness, Taryke Jacobs, testified Defendant's gun never left his car that night. He says when they all heard the first shot Defendant was in front of him and just started running to his car and he did not have a gun with him when that occurred. Jacobs said they heard other shots fired as they were running away. His testimony in the record does not reveal the direction from which the shots were fired.

Jashanna Drake gave confusing and inconsistent testimony and the majority finds her testimony "confusing and totally lacking in credibility." She testified that Defendant fired his weapon while standing beside his car and says she did not see the victim at the time. She ultimately says she did not see Defendant shoot the victim and she did not see Washington fire a gun. She also testified at trial Defendant fired his weapon, as he claimed, in the air to frighten the crowd. According to her trial testimony she says she lied when she first told police investigators that Defendant accidentally fired his weapon.

Monteca Drake said she saw Defendant fire the first shot, but she said she too, did not see the victim near Defendant when the shot was fired. Both Jashanna and Monteca telephoned Jacobs after the incident and suggested Defendant fired shots. Another witness, Shadavai Capedeville, first told police Defendant fired a shot in the air but at trial she testified Defendant shot the victim.

Quiamie Randolph stated Defendant started the fight inside the building when he hit the victim in the head from behind. The coroner testified there was no evidence of any head injury on the victim. Randolph says Defendant was facing toward her and the victim, and that as the victim ran toward and swung at Defendant "the gun went off" as the victim hit Defendant. She also said the gun touched the victim but then said the gun was "very close" to touching the victim. The coroner says the bullet that killed the victim was fired from several feet away.

No expert could conclude the caliber of bullet that caused the victim's death because the bullet exited his body. Ultimately, the most that can be gleaned from the uncontradicted evidence is that: (1) there *may have been* two to three guns belonging to two or three different people at the scene; (2) two of the guns were not recovered but *may have been* nine-millimeter caliber; (3) the victim died of a gunshot wound that *may have been* fired by a nine-millimeter gun; and (4) the expert cannot say what gun or even what caliber of gun fired the fatal shot. Beyond that, the testimony of eyewitnesses is riddled with contradictory pre-trial statements and trial testimony.

I do not believe this, or any court, can say **beyond a reasonable doubt** that the admittedly prejudicial and highly inflammatory photo of Defendant could not possibly have contributed to the verdict. I believe the evidence shows the State presented an extremely weak case against Defendant and shows the inflammatory evidence wrongly admitted tipped the scales against Defendant. There is more than just the possibility that this evidence contributed to the guilty verdict in this case and there is certainly reasonable doubt that a guilty verdict would have been reached without this evidence poisoning the jury's mind. The majority candidly admits the evidence was *highly prejudicial, inflammatory, of no probative value* to the case and should not have been admitted. Defendant is a young man with no prior record of any criminal offense or bad behavior. He was preparing to attend college and was well thought of by his teachers, family and friends. He stands convicted of manslaughter and

sentenced to serve the next twenty years of his life in prison because a jury was shown a photo of him as a juvenile holding a gun to another juvenile's head. As the majority says "[t]his photograph provided no useful purpose at trial [and] it add[ed] nothing to help the jury reach a verdict. The photograph depicted nothing related to the crime for which the defendant was on trial." More compelling is the majority's finding that the photo "did, however, present a disturbing image to the jury that portrayed the defendant as one who held a gun to a young boy's head. Only later in the trial did the jury hear testimony explaining the photograph, which in itself did not cast the defendant in a particularly good light." The bell could not be un-rung, and I believe its tolling at the very least "might possibly" have resulted in the guilty verdict. Most assuredly we cannot say beyond a reasonable doubt that this erroneously admitted evidence did not possibly impact the jury's verdict. Under the Louisiana State Supreme Court's test we cannot say it was harmless error to admit this evidence and thus we must properly conclude Defendant was deprived of his constitutional right to a fair trial. Defendant's conviction must be reversed and his case remanded for a new trial absent this prejudicial, inflammatory, non-probative, and utterly irrelevant evidence. For these reasons I respectfully dissent.